# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

## CIVIL NO. 1:02CV224

| | |
|---|---|
| LOCAL 2-1971 OF PACE INTERNATIONAL UNION; PAPER ALLIED-INDUSTRIAL, CHEMICAL & ENERGY WORKERS INTERNATIONAL UNION, on behalf of members and former member participants in pension plans sponsored by the Defendants; JOY M. O'DELL, RAYMON C. GALLOWAY, JAMES F. SUMNER, W. HARRISON WHITLOCK, HUEY W. HARRIS and GURLIE R. OWEN, on behalf of themselves and others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| LANGDON M. COOPER, Trustee in Bankruptcy for RFS Ecusta, Inc., and RFS U.S., Inc.; RFS ECUSTA, INC.; PURICO (IOM), LTD.; RF & SON, INC.; NATHU PURI, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OF DECISION

**THIS MATTER** came on trial before the Court, without a jury, on May 3-6, 2005, on Plaintiffs' claim for violation of the Workers Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101, *et seq*.

Under the WARN Act, "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to the representative(s) of the affected employees or, if no representative exists, to each of the affected employees.  **29 U.S.C. § 2102(a).**  Violation of this requirement opens the employer to liability in the form of back pay for each day of violation and benefits under an employee benefit plan.  **29 U.S.C. §§ 2104(a)(1)(A), (B).** If, however, "the closing or layoff constitutes a strike or constitutes a lockout not intended to evade the requirements of [the WARN Act]," the notice requirement is inapplicable.  **29 U.S.C. § 2103(2).**  Such is the issue here, with Plaintiffs asserting that an improper "layoff" occurred, and Defendants[1] contending that Plaintiffs were the subject of a "lockout."

---

[1] The caption in this case has been changed to reflect only the active Defendants after settlement of the ERISA claim and the voluntary dismissal of Defendants Wachovia Bank, N.A., and Transamerica Business Capital Corporation.

# I. PLAINTIFFS' MOTION *IN LIMINE*

Plaintiffs' filed a motion *in limine* prior to trial seeking to prevent the Defendants from litigating the issue of whether a layoff occurred at the Ecusta mill and basing their argument on a decision of the Employment Security Commission of North Carolina ("ESC"). The Court took the matter under advisement rather than issue an opinion at that time. For the reasons that follow, the Court denies Plaintiffs' motion.

Plaintiffs participated in an unemployment hearing before the ESC on September 23, 2002. **See, Exhibit A, Decision of the Employment Security Commission of North Carolina, *attached to* Plaintiffs' Motion in Limine, filed April 29, 2005.** On October 1, 2002, the presiding Special Deputy Commissioner issued his written opinion, finding that the Plaintiffs were "not unemployed due to a labor dispute in active progress," but rather were unemployed because the plant closed due to economic conditions. ***Id.*, at 5.** Plaintiffs believe this decision acts to collaterally estop the Defendants from litigating in this Court the issue of whether a layoff occurred.[2]

---

[2] In appropriate circumstances, administrative proceedings may properly serve as the basis for collateral estoppel. ***See, e.g., Baltimore Luggage Co. v. Samsonite Corp.*, 977 F.2d 571 (table), 1992 WL**

For collateral estoppel to apply, the party asserting the doctrine must show "(1) the issue to be precluded is identical to the issue already litigated, (2) the issue was actually determined in the prior proceeding, (3) the determination of the issue was an essential part of the decision in the prior proceeding, (4) the prior judgment was final and valid, and (5) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issue." **Coleman v. Cmty. Trust Bank (In re Coleman), 426 F.3d 719, 729 (4th Cir. 2005).** Additionally, in all cases "the application of collateral estoppel remains subject to considerations of fairness." **Swentek v. USAIR, Inc., 830 F.2d 552, 563 (4th Cir. 1987).** "[T]here has been general agreement – to the point of convention – that among the most critical guarantees of fairness in applying collateral estoppel is the guarantee that the party sought to be estopped had not only a full and fair opportunity *but an adequate incentive to litigate 'to the hilt' the issues in question*." **Prosise v. Haring, 667 F.2d 1133, 1141 (4th Cir. 1981) (emphasis added); *see also*, Clark v. Clark, 1994 U.S. App. LEXIS 33685, at \*7 (4th Cir. 1994).**

---

**296368, at \*3 (4th Cir. 1992); *Ross v. Commc'n Satellite Corp.*, 759 F.2d 355, 360 (4th Cir. 1985), *abrogated on other grounds by*, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).**

The Court finds that it would be fundamentally unfair to allow the decision of the ESC to operate as collateral estoppel in this case.  The North Carolina General Statutes provide:

> Any finding of fact or law, judgment, determination, conclusion or final order made by an adjudicator, appeals referee, commissioner, the Commission or any other person acting under authority of the Commission pursuant to the Employment Security Law *is not admissible or binding in any separate or subsequent action or proceeding, between a person and his present or previous employer brought before an arbitrator, court or judge of this State or the United States*, regardless of whether the prior action was between the same or related parties or involved the same facts.

**N.C. Gen. Stat. § 96-4(t)(8) (emphasis added).**  Through this provision, "[t]he North Carolina legislature has distinguished ESC hearings and civil trials as distinct proceedings by explicitly rejecting . . . admissibility in civil tribunals" of any judgment, conclusion, determination, finding of fact or law, or final order.  ***Hartsell v. Duplex Products, Inc.*, 895 F. Supp. 100, 103 (W.D.N.C. 1995), *aff'd*, 123 F.3d 766 (4ᵗʰ Cir. 1997).**  Defendants were entitled to rely on this provision – found in the same chapter from which Plaintiffs drew their authority to seek unemployment benefits from the ESC in the first place – when deciding whether and to what extent to defend their actions as a "lockout" rather than a "layoff" before the Commission.

Plaintiffs' had the burden of establishing the applicability of collateral estoppel and, based on the language § 96-4(t)(8), the Court is not convinced that the guarantee of fairness has been sufficiently satisfied. Therefore, the Court declines to give preclusive effect to the determination of the ESC.[3]

## II. WARN ACT LIABILITY

### A. Standard

As noted *supra*, the WARN Act requires that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to the representative(s) of the affected employees or, if no representative exists, to each of the affected employees individually. **29 U.S.C. § 2102(a).** Plaintiffs bear the initial burden of establishing a *prima facie* case under the

---

[3] The Court also has serious reservations about giving preclusive effect to a five page opinion, consisting of thirteen findings of fact and a page and a half of conclusions of law, which resulted from a hearing that occurred barely one month after the employment action in question. Whether all of the facts and legal issues necessary to the instant action were appropriately and fully vetted in that proceeding, such that the Defendants should be precluded from litigating the "lockout" issue in this Court, is a question the Court would have a difficult time answering in the affirmative.

Act that, (1) there was a "plant closing" or "mass layoff," (2) by an

"employer," (3) before the end of a 60-day period after the employer served

written notice of such an action.   *See*, **29 U.S.C. § 2102;** *see also*,

*Palmer v. Reese Bros., Inc.*, **160 Fed. Appx. 173, 176 (3d Cir. 2005);**

*Johnson v. TeleSpectrum Worldwide, Inc.*, **61 F.Supp.2d 116 (D. Del.**

**1999).**  The Act provides the following definitions relevant to Plaintiffs'

required showing:

> [T]he term "employer" means any business enterprise that
> employs – (A) 100 or more employees, excluding part-time
> employees; or (B) 100 or more employees who in the
> aggregate work at least 4,000 hours per week (exclusive of
> hours of overtime)[.]
>
> [T]he term "plant closing" means the permanent or temporary
> shutdown of a single site of employment, or one or more
> facilities or operating units within a single site or employment, if
> the shutdown results in an employment loss at the single site of
> employment during any 30-day period for 50 or more
> employees excluding any part-time employees.
>
> [T]he term "mass layoff" means a reduction in force which –
> (A) is not the result of a plant closing; and (B) results in an
> employment loss at the single site of employment during any
> 30-day period for – (i)(I) at least 33 percent of the employees
> (excluding any part-time employees); and (II) at least 50
> employees (excluding any part-time employees); or (ii) at least
> 500 employees (excluding any part-time employees)[.]

**29 U.S.C. §§ 2101 (a)(1), (2), (3).**  "The point in time at which the number

of employees is to be measured for the purpose of determining coverage

[*i.e.*, the "snapshot" date] is the date the first notice is required to be given."

**20 C.F.R. § 639.5(a)(2).**

If Plaintiffs carry their burden of establishing a *prima facie* case, the burden then shifts to the Defendants to establish an exception or exemption so as to avoid liability. The WARN Act provides three exceptions and two exemptions to the notice requirements. ***See* 29 U.S.C. §§ 2102(b)(1), (2), 2103(1), (2).** Relevant to this case is the "lockout exemption," which provides: "This chapter shall not apply to a plant closing or mass layoff if – . . . (2) the closing or layoff constitutes a strike or *constitutes a lockout not intended to evade the requirements of this chapter*." **29 U.S.C. § 2103(2) (emphasis added).**

In order to take advantage of this exemption, the Defendants must establish[4] (1) that a lockout actually occurred, and (2) that the lockout was

_____

[4] The WARN Act regulations specifically state that the employer bears the burden of establishing the exceptions found in 29 U.S.C. § 2102(b). ***See* 20 C.F.R. § 639.9; *see also, Local Union 7107, UMW v. Clinchfield Coal Co.*, 124 F.3d 639, 641 (4th Cir. 1997).** However, neither the Act nor the applicable regulations assign to a particular party the burden in regards to the exemptions found in 29 U.S.C. §§ 2103(1) and (2). Other courts have held that, absent contrary authority, the employer bears the burden of establishing the strike exemption found in § 2103(2). ***See, e.g., Teamsters Nat'l Freight Indus. Negotiating Comm. v. Churchill Truck Lines, Inc.*, 935 F. Supp. 1021, 1026 n.12 (W.D. Mo. 1996), *aff'd*, 121 F.3d 447 (8th Cir. 1997).** This Court finds that, absent

not intended to evade the requirements of the WARN Act.  In the context of

the WARN Act, a lockout is defined as "occur[ring] when, [A] for tactical or

defensive reasons during the course of collective bargaining or during a

labor dispute, [B] an employer lawfully refuses to utilize some or all of its

employees for the performance of available work."  **20 C.F.R. § 639.5(d).**

In regards to the "intent to evade" element of the lockout exemption,

there is no guidance from the Act or the regulations as to whether an

"intent to evade" must be the sole reason for the lockout before an

employer is prohibited from utilizing the exemption, whether it must be the

predominate reason where there are mixed motives for the lockout, or

whether any level of "intent to evade," regardless of how predominate it

figures in the decision to lockout employees, is sufficient to prohibit an

employer from relying on the lockout exemption.  To make this

determination, the Court has considered both the purpose of the WARN

Act and the treatment given to other exceptions within the Act.  The

regulations define the purpose of the WARN Act as follows:

---

contrary authority, the employer also bears the burden of establishing that
the lockout exemption of § 2103(2) applies in a particular case to defeat
liability.

> The [WARN Act] provides protection to workers, their families
> and communities by requiring employers to provide notification
> 60 calendar days in advance of plant closings and mass
> layoffs.  Advance notice provides workers and their families
> some transition time to adjust to the prospective loss of
> employment, to seek and obtain alternative jobs and, if
> necessary, to enter skill training or retraining that will allow
> these workers to successfully compete in the job market.

**20 C.F.R. § 639.1 (Purpose and scope).**  Even where notice is not technically required by the Act, "[i]t is the sense of Congress that an employer should . . . to the extent possible, provide notice to its employees about a proposal to close a plant or permanently reduce its workforce."  **29 U.S.C. § 2106.**  In other words, the WARN Act is both protectionist in its attempt to insulate employees, their families, and communities from the harms attendant to plant closings or mass layoffs that occur without advance notice, and remedial in its allowance of private actions to recover the wages and benefits that would have been received during the 60-day notice period when notice is not given.  ***See, e.g., Local Union 7107, UMW v. Clinchfield Coal Co.***, 124 F.3d 639, 640 (4th Cir. 1997) ("[T]he WARN Act is remedial legislation[.]").

The Court has also considered the treatment of the other exceptions and exemptions within the WARN Act.  The Fourth Circuit has held that because of the nature of the WARN Act, "its exceptions are construed

narrowly." ***Id.***; ***see also, Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.***, 15 F.3d 1275, 1282 (5th Cir. 1994); 20 C.F.R. § 639.9(a).  The Court believes that, given the nature and purpose of the Act, the lockout exemption should receive the same narrow construction.

Considering both the nature and purpose of the Act and the narrow construction given the Act's other provisions for avoiding liability, it is quite clear that the "intent to evade" the requirements of the Act need not be the sole reason for the purported lockout to prevent application of the lockout exemption.  To hold otherwise would simply be inconsistent with the established jurisprudence concerning the WARN Act.  That leaves two alternatives: to benefit from the exemption, the "intent to evade" cannot be a predominate reason for the purported lockout; or, there cannot be *any* level of "intent to evade" if an employer seeks the benefit of the exemption. In this case, the Court does not have to decide which of these alternatives is most appropriate.  For reasons stated below, the Court finds the Defendants have failed to establish that the intent to evade the notice requirements of the WARN Act was not a predominate reason for the purported lockout, and therefore, by necessity, they could not have satisfied a more stringent "absolutely no intent to evade" test.

**B. Findings of Fact**

Having heard the testimony of the 19 witnesses in this case, and considered the exhibits and deposition testimony proffered by the parties, the Court makes the following findings of fact in regards to Plaintiffs' WARN Act violation claim.

"Ecusta was founded in 1939 by Harry Straus as the Ecusta Paper Corporation, and was the first mill built to manufacture cigarette papers in the U.S." **Plaintiffs' Exhibit ("Pl. Ex.") 80.** After changing hands in 1949 and again in 1985, the P.H. Glatfelter Company acquired Ecusta in 1987. *Id.* The Ecusta mill produced both cigarette paper and printing paper primarily utilized by the financial industry. The cigarette paper was produced in the "old" side of the mill, while the printing paper was produced on the "new" side of the mill. **Defendants' Stipulated Fact # 11[5]; Trial Tr. vol. 2 at 373; vol. 3 at 692-93.** Plaintiffs, hourly production and

---

[5] Two different Proposed Stipulations of Fact were filed by the respective parties in this case. Various statements on each proposal were agreed to by the opposing party, while others were not. Because the parties did not create one unified document providing the agreed-upon stipulations of fact, the Court will refer to an agreed-upon stipulation of fact appearing on the document submitted by the Defendants as "Df. Stip. Fact #___," and refer to an agreed-upon stipulated fact appearing on the document submitted by the Plaintiffs as "Pl. Stip. Fact # ___."

maintenance employees at the Ecusta mill, were represented by Local 2-1971 of the PACE International Union.[6]  **Df. Stip. Fact # 13.**

Defendant Nathu Puri first became aware of the Ecusta mill in 1985 when he was in the process of acquiring his first paper mill in the United Kingdom.  **Trial Tr. vol. 4 at 748.**  Puri engaged in numerous discussions with Glatfelter over more than ten years regarding acquisition of the Ecusta mill.  It was not until 2001, however, that Puri's family of corporations finally acquired the Ecusta mill.  *Id., at 749-64.*  The acquisition, which carried a price-tag of approximately $28.6 million, was made possible by a loan agreement with Transamerica Business Capital Corporation ("TBCC") in which TBCC agreed to make loans and extend credit in an aggregate amount not to exceed $40 million.  *Id., at 786;* **Df. Stip. Fact # 25.**

The "family tree" of corporations had the following form after acquisition of the Ecusta mill:

---

[6] At all times relevant to this matter the employees were represented by PACE International Union.  PACE merged with the Steelworkers Union on April 14, 2005, and took on a new name.  **Trial Tr. vol. 1 at 135-36.**  For simplicity's sake, any reference herein to the union's name will be by the name "PACE."

(1) Nathu Puri owned 86 percent of Clary Ltd., with the remaining 14 percent owned by members of his family in 2 percent shares;[7]

(2) Clary Ltd., owned 100 percent of Defendant Purico (IOM), Ltd.;

(3) Purico (IOM), Ltd., owned 100 percent of Purico U.S., Inc.;

(4) Purico U.S., Inc., owned 100 percent of Defendant RF & Son, Inc.;

(5) RF & Son, Inc., owned 100 percent of RFS U.S., Inc., and Defendant RFS Ecusta, Inc.

**Pl. Ex. 72; Trial Tr. vol. 4 at 869-71.** When the acquisition occurred, RF & Son, Inc., acquired the intellectual property; RFS U.S., Inc., acquired the physical (*i.e.*, fixed) assets; and RFS Ecusta, Inc., acquired "the business" (*i.e.*, non-fixed assets). **Trial Tr. vol. 4 at 861-62.** At the time of acquisition, the Ecusta mill was not the industry leader it had once been. Due to lack of investment in research and capital improvements by Glatfelter, "the Ecusta mill went from the most technically advanced cigarette paper supplier in the late 1980's, to one of the least innovative suppliers by the mid-1990's." **Pl. Ex. 80.** Puri stated that his goal in

---

[7] Although it has no bearing on the outcome of this case, the Court notes for the record the slight discrepancy between the testimony of Nathu Puri that he owned 86 percent of Clary Ltd., and the Stipulated Fact that he owned 84 percent. **See, Trial Tr. vol. 4 at 869; Pl. Stip. Fact #40.**

acquiring the mill was to return it to its former greatness. **Trial Tr. vol. 1 at 36.** Puri believed this would require, among other things, capital improvements to the mill. **Trial Tr. vol. 4 at 819-20.**

When the mill was acquired, the collective bargaining agreement (CBA) negotiated between the local PACE union and Glatfelter in 1996 was also assumed. **Trial Tr. vol. 1 at 163.** The CBA was set to expire on October 1, 2001. **Joint Ex. 2.** Prior to and after acquisition of the Ecusta mill, Puri made it known to the union that concessions would be requested in the soon-to-occur negotiations and that these concessions would be required in the new CBA if the mill was to survive. **Trial Tr. vol. 3 at 582-83; vol. 4 at 845-47.** Puri believed there was a direct relationship between the company making the much-needed capital investments and the union accepting concessions. **Trial Tr. vol. 4 at 842.** Pre-negotiation discussions regarding these concessions centered around the recently negotiated CBA's at other plants which involved approximately a 15 percent reduction in wages and benefits. ***See, e.g.,*** **Trial Tr. vol. 1 at 141; vol. 4 at 845-47.**

Negotiations between RFS Ecusta and the union for a new CBA began on or about September 1, 2001. **Trial Tr. vol. 1 at 139.** The

proposal made by the company in September 2001, which the union believed to be in the neighborhood of a 40 percent concession, was unacceptable to the union. **Id., at 143; vol. 3 at 596-99; Pl. Ex. 76.** The union voted to reject the company's proposal, which proved to be the last union vote on any management CBA proposal. **Trial Tr. vol. 1 at 148.** After rejecting the offer, the union achieved the necessary two-thirds vote of membership to strike. **Id., at 145-46.** The union went on strike at or about 12:01 a.m., on October 16, 2001, with the strike lasting approximately four weeks. **Id., at 147; vol. 4 at 801-03; Df. Stip. Fact # 33.**

The strike severely damaged the company and its customer base. On the tobacco side of the mill, the company lost some or all of its business with R.J. Reynolds Tobacco, Lorillard, and the affiliates of British American Tobacco ("BAT"), which were Brown and Williamson Tobacco Company, Cigarerro, and Imperial Tobacco. Although the company still had a commitment from Bowne, the largest customer on the new side of the mill, the company "lost quite a bit of the other printing paper business" and also discovered that it would "lose a large piece of specialty business with Proctor & Gamble." **Trial Tr. vol. 3 at 727; *see also*, Trial Tr. vol. 2**

**at 372-73.** Nathu Puri would later remark that he did not believe there was any chance of getting back all of the business the company lost due to the strike. **Pl. Ex. 78.**

The striking employees returned to work in mid-November 2001 after the company and union executed a Memorandum of Understanding ("MOU"). Pursuant to the MOU, the employees would return to work under the same terms and conditions contained in the now-expired CBA, and the company and union would continue their efforts to reach a new CBA. The MOU could be terminated on 14-days' written notice by either party; however, while the MOU was in place, the union could not strike and the company could not lock out the union employees. **Joint Ex. 10.** Not all employees were returned to work, however. Due to the economic consequences of the strike, approximately 247 of some 750 hourly workers and 60 of the 250 salaried workers were unable to be re-employed when the strike ended. **Trial Tr. vol. 2 at 374-75; vol. 3 at 694.**

Steve Smith joined RFS Ecusta, Inc., in January 2002 as the company's chief operating and financial officer and took over the CBA negotiations for the company. **Df. Stip. Fact # 39.** He joined David Poor (plant manager, and by all accounts the "real" chief operating officer),

Richard Wall (manager of human resources), Jim McMillan (director of accounting, purchasing, and business support), Jim Manning (controller), Mike Kirby (vice president of sales and marketing), and Upendra Puri (chief executive officer and nephew of Nathu Puri), to form the management team of RFS Ecusta, Inc. **Trial Tr. vol. 2 at 368.** Soon after Steve Smith's arrival, Upendra Puri left the mill both because of animosity with the union and the effect that animosity might have on the labor negotiations, and because of threats made against his life. **Id., at 367.** With Upendra Puri's departure, Steve Smith essentially assumed the role of chief executive officer in addition to his aforementioned duties.

On or about January 8, 2002, and prior to the scheduled January 2002 CBA negotiation session, Nathu Puri sent or caused to be sent a letter to the members of the "Transylvania County Community." **Pl. Ex. 71; Trial Tr. vol. 3 at 533.** The letter related that the company's financial situation had "deteriorated significantly over the last year," that "[t]he recession and an oversupply of paper in the marketplace have led to a collapse in prices for financial printing," and that the company had lost key customers as a result of the union's strike in 2001. **Pl. Ex. 71.** Puri also remarked that "[e]ven if a buyer [to purchase the Ecusta mill] emerged out

of thin air, he would face the same business problems [faced] today: high operating costs, low productivity, severely reduced orders and no more time to salvage customer relationships." *Id.* Based on the totality of the other evidence reflective of the financial situation occurring at the mill during this period, Nathu Puri's letter was substantially accurate in regards to both the situation as it existed at that time and in its foreshadowing of the likely future the mill faced.

The company and union met for negotiations on January 15, 2002. Puri informed the union representatives of the company's financial predicament, the effect of the October 2001 strike on the company vis-á-vis its customer base, and the consequences the mill would face if a labor agreement was not reached in the immediate future. **Pl. Ex. 78.** The January 15th negotiation session did not prove successful. On January 16, 2002, Steve Smith posted a notice to employees, in the form of a newsletter titled the "Cherry Tree," informing the employees of the likely future faced by the company and its employees if a CBA was not reached soon. **Trial Tr. vol. 3 at 497-98.**

In late January or early February, Steve Smith began to feel that animosity between the company's labor attorney and the union was

hindering negotiations. The company dismissed its labor lawyer and hired attorney Gene Webb to serve as its new labor counsel in the CBA negotiations. **Trial Tr. vol. 2 at 376; vol. 3 at 497, 632.** With Steve Smith and Gene Webb now at the helm to steer the company's negotiations of a new CBA, Ecusta took a new approach to the negotiations. Richard Wall described it as "a kindler, gentler approach and a more fact-based approach. Significantly less confrontational; significantly more willing to negotiate." **Trial Tr. vol. 3 at 697.** This new approach was reflected at the March 19, 2002, negotiation session between the company and the union. The company deceased the amount of concessions it previously proposed, down from the approximately 37 percent mentioned in September 2001, to an average of approximately 20 percent per employee. The company provided full disclosure of its financial information to demonstrate to the union why the level of concessions reflected in the proposal was necessary. The company also provided the union with an employee-by-employee analysis of the concessions because some employees would be giving up slightly more than 20 percent while others would be slightly below that level. Finally, the company provided a side-by-side comparison of the company's and union's pension plans, which was a strong source of

contention between the parties.  **Trial Tr. vol. 2 at 380-82, 388-89; vol. 3 at 639-42; Defendants' Exhibit ("Df. Ex.") 9, 10.**

The union requested an adjournment from the March 19 negotiation session for the purpose of allowing its financial experts to review the proposal.  **Df. Stip. Fact # 44; Trial Tr. vol. 3 at 642.**  Although the union assured the company that analysis of the proposal and an appropriate response would be of the highest priority, by April 17, 2002, the company had received no response from the union.  On April 17, 2002, Steve Smith wrote to Bob Smith, vice president, regional director for PACE International and the union  representative responsible for the Ecusta mill, complaining of the union's slow response.  The company was also angry that the union leadership had apparently advised its union members that there was essentially no change in the company's proposal from September 2001.  **Df. Ex. 12.**

The company and union met again for one day in April 2002.  However, no progress was made in reaching a new CBA.  **Df. Stip. Fact # 45; Trial Tr. vol. 2 at 402-03.**  Thereafter, on April 19, 2002, Steve Smith authored a letter to Jerry Stuart informing him, as the chief elected officer of the local PACE union, that a mass layoff was planned between June 22,

2002, and July 7, 2002. **Joint Ex. 12; Trial Tr. vol. 2 at 404-05.**

According to a letter from Steve Smith to "Fellow Ecusta Employees," also

written on April 19, 2002, the layoffs would affect approximately 250 union

and 80 non-union employees and were the result of lagging tobacco

orders. **Df. Ex. 13; Trial Tr. vol. 2 at 401, 405-09.** Also the same day,

Steve Smith sent a letter to the

ESC informing it of the anticipated layoff of approximately 250 union

employees. **Joint Ex. 11; Trial Tr. vol. 2 at 409.** Essentially the same

letter concerning the non-union employees was sent to the ESC

approximately one month later. **Joint Ex. 13; Trial Tr. vol. 2 at 413.**

Also in April 2002, RFS Ecusta was informed that its ability to borrow

money from TBCC was being curtailed. Howard Handman, the loan officer

with TBCC who handled the Ecusta account from March 2002 forward,

informed the company that it would "no longer have access to borrowing

against the Work-in-process or spare parts inventory balances."

Additionally, TBCC decreased the liquidity available to the company by

increasing the collateral reserve. Handman testified these actions were

taken to reduce TBCC's exposure based on the overall performance and

outlook of the company. **Deposition of Howard Handman, taken June**

**29, 2004, at 6-7, 12, 98-101, 126; Exhibit 15** *attached to* **Handman**

**Deposition.**[8]

On May 23, 2002, Gene Webb contacted Bob Smith by e-mail,

attempting to encourage the union back to the bargaining table.

> I am getting the feeling that the local doesn't much want to meet . . . .  As I think you know, the business is deteriorating as each day passes with no progress toward a new collective bargaining agreement and we will never get one without meeting, even if getting one is near impossible.  Frankly, I don't think the Company has much of anything new to say other than that things are worse than they were the last time we met, and maybe the union is exactly where it was when we last met, but I guess that is what we want to know.

**Df. Ex. 17.**  Bob Smith replied one week later:

> This is the first opportunity to respond to either your earlier e-mail or make a telephone call. . . .  I know that our position on the issues has not changed.  The one thing that became abundantly clear is our members [sic] frustration with present owner.  Unless some sucnificant [sic] changes are made to the Company's last proposal we are going to have some problems achieving and [sic] agreement.

*Id*.  The month of May 2002 passed without any negotiation sessions

between the company and the union.  **Trial Tr. vol. 2 at 416; Df. Stip. Fact**

**# 49.**  By this time it was apparent that even if a CBA was reached by the

---

[8] Handman's deposition was stipulated into the record.  **Trial Tr. vol. 3 at 503.**

parties, there could be no promise of job security at the Ecusta mill.  **Df. Ex. 16.**

On June 1, 2002, Steve Smith sent an e-mail to Nathu Puri covering a variety of topics.  Included in this information was that the company had tobacco orders only until the end of August, and that "Cragg is the only old side tobacco paper customer" remaining.  **Pl. Ex. 105.**  In addition, attached to the e-mail were, among other things, an "Incentive Matrix - 10%" and an "Incentive Matrix - 12%."  **Pl. Ex. 105-M, 105-N.**  Both documents showed the company's projected costs for the period February 2002 through March 2003.  According to these projections, the adjusted hourly payroll for this year-long period would be $22,939,872, or an average of slightly over $1.9 million per month.  This information contradicts Smith's trial testimony that the hourly payroll was only approximately $400,000 per month.  **Trial Tr. vol. 3 at 494-95.**

Also included in this information was a chart showing "Historical Capital Expenditures" at the Ecusta mill.  **Pl. Ex. 105-H.**  The notes at the bottom of the chart relate that Glatfelter, by cutting back on capital expenditures between 1998 and 2001, "has left Ecusta in arrears of $22.1 [million] dollars . . . not includ[ing] inflation" on capital expenditures.  *Id.*

The analysis also noted the deterioration of the facilities and grounds, and that "[a]t least $5 million is needed annually just as maintenance capital." *Id.*

On June 18, 2002, Jim McMillan informed Jim Manning, Steve Smith, Mike Kirby, and David Poor, that the company was "on track for a sales month of $5 to $6 million with expenses in the range of $8 to $9 million. At that rate, its only a matter of weeks, not months, before the cash dries up." McMillan also predicted that, despite efforts to increase business and trim costs, there would likely be a "critical cash situation before the end of July." **Pl. Ex. 125; Trial Tr. vol. 1 at 254-55.** Steve Smith responded, in part, by stating that "we need to implement layoffs on the new sides [sic] employees." **Pl. Ex. 125.**

At some unidentified time, labor unrest began at Ecusta's chief competitor, SMI, which resulted in unexpected business for the old side of the Ecusta mill. On or about June 27, 2002, the company was informed that the union at SMI had rejected management's contract proposal and would "be on the picket line" at least until some point in July 2002. **Pl. Ex. 90.** The following day, June 28, 2002, all of the WARN Act notices given to union employees at the Ecusta mill in April were either extended or

withdrawn.  The withdrawal of notices affected 184 union employees,

which was approximately 75 percent of all union employees who received

WARN notices in April 2002.  **Joint Ex. 15, 16.**  These actions were the

direct result of an influx of orders due to the SMI labor unrest.  **Trial Tr.**

**vol. 2 at 417-19, 425-26; vol. 3 at 705-06.**

On June 29, 2002, Jim Manning e-mailed Steve Smith, Jim McMillan,

Mike Kirby, and David Poor to inform them of the contents of a

conversation he had with Howard Handman regarding TBCC's

restructuring of Ecusta's debt.  According to Manning's e-mail, "[o]verall

[the restructuring of the debt] is good news in that we know what our real

Revolver limit is . . . .  Howard stated that we must live within this structure,

and that *no additional funds would be available.  (So, when the Revolver*

*Available goes to zero, we are out of funds*)."  **Pl. Ex. 111 (emphasis**

**added).**

No CBA negotiation session was held during June 2002, but

negotiations were scheduled for July 18 and 19, 2002.  **Df. Stip. Fact # 49,**

**50.**  In preparation for the July negotiation session, Steve Smith

communicated with Nathu Puri regarding both the changes Puri had

requested in the company's offer and those recommended by the

management team.  **Joint Ex. 29.**  The company had some fear of another strike by the union, and Smith suggested to Puri "that when we consider the costs of a strike that we also think about the cash availability from the bank, which is not going to cover us for more than a month at the most." *Id.*  Smith also presented a 14-point list of "Costs of a strike." *Id.*

The union ultimately cancelled the July 18 and 19 negotiation session, which was to have been the first one to be held in approximately three months.  **Df. Stip. Fact # 50.**  In response, the company conveyed its "last, best, and final offer" ("LBF offer") to the union on July 19, 2002. **Joint Ex. 18; Df. Stip. Fact # 51.**  In the letter accompanying the LBF offer, Gene Webb advised that the latest union offer had been "to extend the old, expired agreement for two years and to maintain the *status quo* until September 30, 2004."  It appears to the Court that the union's last proposal was both regressionary in relation to previous ones and in very poor judgment given the well-documented financial situation at the Ecusta mill.  **Joint Ex. 18.**

Between July 19 and August 1, 2002, Steve Smith and the other members of the management team "looked at three or four options" for how the company could proceed.  **Trial Tr. vol. 2 at 439.**  The team

considered "the lockout approach," "the implementation of our last, final and best offer," and "the possibility of utilizing replacement workers." *Id.*

On July 29, 2002, Steve Smith e-mailed Nathu Puri with business and financial information regarding the Ecusta mill. **Pl. Ex. 126.** This e-mail was forwarded to David Poor, Richard Wall, Jim McMillan, Jim Manning, and Mike Kirby, making the entire management team aware of Ecusta's current financial situation. *Id.*

> Nat,
> A couple of issues:
>          *         *         *
> 2) SMI settled, but I still have not been able to find out the details.
>          *         *         *
> 4) ****CASH, projections indicate we are out of cash now and by mid August will have a deficit of $3,500,000. Really can't have a deficit so vendors will not get paid. We have already begun holding vendor checks so the word is out.
>
> 5) When we issue the 14 day notice, I am thinking this Thursday, we will have no cash to run the operations or protect the assets. I think we will have to lock the gates and send everyone home.
>
> 6) I am having a meeting Wednesday, without significant Bowne orders, it looks like we [are] going to have to fore go [sic] meeting customers delivery dates . . . and reduce the work fore [sic] to bare bones. I think we have 7 days layoff periods before retrogression begins. If, employees use their vacation pay, we do not get ahead on the cash out.
>
> Also no purchases will be made unless absolutely necessary.

Raw mat'l inventories will be run as low as possible.  If a PM is shut down, so be it, the workforces goes [sic] home.  Good only for seven days or regressions begins [sic].

July sales - $5,000,000, Jim McMillan is double checking August and September.  July and August have always been historically low sales months.

P & G is not going to go with the new outer wrap we have been testing.  Tells us that gives them the option to go with Trierenburg. $3,000,000 in sales.

*Id.*  According to Steve Smith, settlement of the SMI labor dispute meant Ecusta would not be receiving more orders from its tobacco customers. "Our hopes that we would be able to build upon a relationship of helping these customers out evaporated[.]"  **Trial Tr. vol. 2 at 437-38.**  Regarding his reference to Bowne in the e-mail, Smith testified that Ecusta was not "anticipating significant orders [from Bowne] in July and August."  *Id., at* **438.**  Although Smith testified that the company still anticipated an expansion of those orders in late August and September 2002, in a July 12, 2002, letter to Nathu Puri, Smith stated that "[w]e just had dinner down here in Asheville with Bowne and the third quarter forecast is very conservative due to the recent S & P 500 companies [sic] accounting debacles and their effect on customer confidence."  *Id.*; **Pl. Ex. 124.**  A TBCC "Client Loan Summary" prepared in August reflecting the loan status

as of July 31, 2002, revealed that approximately $816,000 in liquidity was all that remained of Ecusta's credit line with TBCC on that date. **Joint Ex. 20.**

On August 1, 2002, RFS Ecusta delivered its 14-day written notice to the union that it was terminating the MOU agreement of November 2001. **Joint Ex. 4.** The notice also stated:

> Also, if the Company's last, best and final offer as conveyed to the Union on July 19, 2002, as corrected on July 26, 2002, is not ratified by the Union as of the end of this fourteen (14) day period, the Company will no longer be able to continue in business. If the offer is ratified, I cannot tell you how many of the current employees of the Company will continue as active employees, or for how long. The business is in a very precarious position at this time and management cannot predict what the future will bring to the Company and its employees if we have a new labor agreement.

*Id.* Attorney Gene Webb described the "no longer be able to continue in business" language as "purposefully ambiguous."

> [T]he letter says that if the offer is not ratified, the Company will no longer be able to continue in business. It does not say that employees will be terminated or laid off, or that either of those eventualities will occur at any particular time. It could be read to state that the Company will go out of business on August 16 if the offer is not accepted by August 15, but it doesn't say that. It could mean that we think the union will call a strike on the 16th which would almost surely put us out of business, or it could mean we will lock out employees on that date, neither of which requires a WARN notice. The language was purposefully ambiguous. In short, we have decided nothing

that would require a warn [sic] notice at this time, in part,
because it depends on what the union does in reaction to the
notice of today.

**Joint Ex. 21;** *see also,* **Trial Tr. vol. 3 at 662-63.** However, when Steve

Smith delivered the MOU termination notice to Jerry Stuart and William

Bryson (trustee of local union), Stuart asked him about the WARN Act's

notice requirement. Stuart testified that Smith's reply was to the effect of

"it doesn't really matter, if you're out of business, you're out of business, if

you're out of money, you're out of money." **Trial Tr. vol. 1 at 40.**

Union representative Harold Huffman responded by letter on August

2, 2002. The union requested access to "all financial records of the

company" because the company's "statement that the business is in a very

precarious position as to being able to continue to operate, leads us to

believe that the company is declaring an inability to continue to operate

financially." **Pl. Ex. 127-A;** *see also,* **Trial Tr. vol. 1 at 151.** Also on

August 2, Steve Smith met with Huffman, Jerry Stuart, Larry Owenby

(financial secretary of the local union), and Angela Elliott (recording

secretary of the local union). **Trial Tr. vol. 3 at 519.** As recording

secretary, Elliott took notes at this meeting. *Id.,* **at 520; Pl. Ex. 37.** Elliott's

handwritten notes, her trial testimony, and the trial testimony of Huffman

reflect that upon being asked if the mill went down whether he would consider it to be a lockout or a layoff, Steve Smith replied that he would consider it to be a layoff because there was no money to, among other things, pay the employees.  **Trial Tr. vol. 1 at 153; vol. 3 at 521-22; Pl. Ex. 37.**

In addition to its contact with the union, the company was also contacted by Howard Handman of TBCC on August 2.

> Members of your management have advised us that availability under the Loan Agreement as well as the Borrowers' cash on hand will soon be depleted, and that the Borrowers' workers' compensation insurance may be terminated if premiums are not paid.  Moreover, we understand that insurance coverage may be unavailable due to Borrower's ongoing labor issues. We further understand that given these facts, management anticipates a shutdown of your operations within the next several days.  We are deeply troubled by these circumstances. You are hereby requested to provide the Agent by 5:00 p.m. (New York time) on August 7, 2002 with the Borrowers' detailed plan for addressing their liquidity crisis.

**Pl. Ex. 81.**  Having chosen to shut down, Handman did not believe the mill would be able to reopen.  **Huffman Deposition, at 110.**  A "Client Loan Summary" prepared by TBCC around the same time reflected a similar understanding.

Executive Summary:

o.   The company has reached the end of the peak sales season for financial printing paper for Bowne Communications.

\*          \*          \*

o.   On 8/2, TBCC was informed that the company issued a 14 day notice to all union employees that the contract is terminated.

o.   *The company has come to the conclusion that they lack the funds to continue to operate, and plan a shutdown for 8/15.*

o.   Management asked the shareholder to provide capital, but he was unwilling to commit.

o.   TBCC issued a letter to the shareholder requested [sic] additional capital, but have not received any response.

\*          \*          \*

o.   Bankruptcy and/or liquidation is highly likely absent a shareholder infusion, or a sale of the company on an expedited basis.

**Joint Ex. 20 (emphasis added).**  The company never provided a plan or acceptable response to TBCC's August 2, 2002, letter.  **Pl. Ex. 83.**

On August 13, 2002, the company delivered a lockout notice to the union stating, in relevant part:

Having been given the 14-day notice of termination, you are hereby notified that, effective 12:01 AM on August 16th, 2002, RFS Ecusta Inc. will lock out all hourly employees represented by Pace Local No 2-1971, pending the approval of the Company's last, best and final offer as previously conveyed to the Union on July 18, 2002.

**Joint Ex. 25.**  Steve Smith, signatory of the lockout notice, did not think the union would accept the offer.  **Trial Tr. vol. 2 at 472-73.**  Also on August

13, the company provided notice of the pending employment action to the

ESC stating that "approximately 464 hourly workers will be locked out with

approximately 112 exempt and non-exempt employees laid off." **Joint Ex.**

**24.** Gene Webb described the reasons for choosing this action as follows:

> I must confess that I tend to be somewhat of a purist and I
> know the value of truth. Some truths are elusive, but here
> there is a very strong, written record of the fact that we locked
> out the bargaining unit employees. It has been in the paper,
> written in letters, posted at the gates of the plant, and probably
> would be established in a hundred other ways. We deliberately
> chose the path of lockout as (a) a defensive measure to allow
> an orderly shutdown of the plant, (b) an offensive measure to
> hammer the union into submission, and (c) *as a strategy to
> avoid 60 days' pay for each and every bargaining unit
> employee who was shut out from work without 60 days
> advance notice.* I think it would be dishonest NOW to say we
> really didn't lock everyone out but that we just laid everyone off,
> in direct violation of WARN, because we couldn't meet the
> payroll. Further on the phone with you . . .

**Pl. Ex. 130 (emphasis added);** *see also***, Trial Tr. vol. 3 at 666; vol. 2 at**

**362-63 (wherein Steve Smith is confronted with his deposition**

**testimony that the path of lockout was specifically chosen, among**

**other things, to avoid 60 days' pay for the union employees shut out**

**from work without notice).**

On August 16, 2002, the "bargaining unit employees represented by

the Local Union were denied access to the Ecusta Mill, signs were posted

at the Ecusta Mill advising bargaining unit employees that they were locked out and were not permitted to work, and the gates to the facility were locked." **Df. Stip. Fact # 56.** No paper was produced at the Ecusta mill after August 15, 2002. **Pl. Stip. Fact # 31.**

The situation at the Ecusta mill as it existed on August 16, 2002, is best described through the words used by members of Ecusta's management team:

> Q. Was there cash available had the 500 or 600 people, or whatever number it was, substantial number of people, had they stayed and worked for the next pay period, was there money on hand to pay their - - to meet the payroll?
>
> A. We did not have the ability to secure additional funding from the bank at that point.

**Trial Tr. vol. 1 at 258 (testimony of James McMillan, Director of Accounting, Purchasing, & Business Support for RFS Ecusta).**

> Q. Would [the amount of money available through Transamerica] have been sufficient to meet the costs of the next period?
>
> A. The next period being defined as what?
>
> Q. The month of August. Let's say August 15th to the end of the month.
>
> A. The judgment that I had at the beginning of August was we did not have ability to secure adequate

funding to make it to the end of August, only until the middle of August.

Q.   And the middle of August is when the gates were locked; is that correct?

A.   That's correct.

**Id., at 263 (same).**

Q.   And you anticipated that by mid August . . . there was going to be a deficit of three-and-a-half million dollars?

A.   Looking at the projections that were discussed earlier, there was expenses in excess of income of this amount.

Q.   Had you come to the conclusion by July 29th that you had to shut down in the middle of August?

A.   We came to the conclusion, without a CBA, we were going to have to shut down.

                    *          *          *

Q.   Mr. Handman wrote a report dated July 31st which stated that RFS Ecusta had come to the conclusion that they lacked the funds to continue to operate and plan a shutdown for 8-15.  Was that - - did he misunderstand what you told him?

A.   No, I don't think he misunderstood.

Q.   Okay.  By 8-15, did you, in fact, have the - - did he lack the funds to continue operations?

A.    We - - as of 8-15, without a CBA, we lacked the
      funds to run the operations as they were being run
      prior to 8-15.

**Trial Tr. vol. 2 at 316-17 (testimony of Steve Smith).**

Q.    Okay.  Isn't it true that you did not implement - - that
      you could not afford to implement the last, best and
      final offer?

A.    We could not afford?  No, I can't say that I
      specifically recall that we could not afford to
      implement our last, final, best - - no, most - - yes.
      We would not have been able to afford to
      implement our last, final and best offer.

Q.    You would not have been able to afford it?

A.    Yes, correct.

***Id.,* at 319-20 (same).**

In an e-mail from Ecusta's controller, Jim Manning, dated August 16,

2002, Jim McMillan, David Poor, Mike Kirby and Richard Wall were

advised of the dire financial circumstances facing the company at that

point:

Now that TA's [Transamerica's] auditor, Joe Levy, has been
here for a week, TA knows everything about our cash situation.
They know that:

1.    We already ran salary checks for August (that shows TA
      we are one step ahead of them & Nat, they will not
      appreciate it). . . .

2.   We have already borrowed money for the hourly payroll
     being paid today and what will be paid next week.  (again,
     this will not be appreciated by TA in NY).
3.   We are holding over $2 million in vendor checks.
     (TA likes this)
4.   Production has stopped, workers have gone home, and
     we are closing the business.
5.   We are "broke" and "out of business."

**Pl. Ex. 129.**

Q.   And why were [the vendor checks] not mailed to the
     vendors?

A.   The lack of funds to cover the checks.

                    *          *          *

Q.   The next line says: "We are broke and out of business."

A.   Certainly Mr. Manning's opinion.

Q.   Well, since you have said that, was it your opinion?

A.   I would agree that, from a financial standpoint,
     yeah, we were broke.

**Trial Tr. vol. 1 at 257 (testimony of James McMillan).**

Although David Poor testified that there was still some amount of

work to be done at the mill on August 16, 2002, in the form of printing

paper orders for Bowne, no witness established the quantity of this work,

the number of employees the work would have sustained, or for how long.

**Trial Tr. vol. 3 at 741.**  The closest thing to such evidence was Richard

Wall's "guess" that Bowne orders may have employed 40 percent of the

mill's workers. *Id.,* **at 718.** However, not only was this a guess without any

evidentiary support, Wall did not explain whether the guess was an

average guess, whether it represented the situation as of August 16, or

whether it represented the situation for the coming months. Nor did he

explain whether his guess took into account the conservative forecast for

Bowne orders in the coming months or whether his guess would be altered

by the fact that August was a historically slow month for the Ecusta mill.

On August 22, 2002, Steve Smith produced three letters regarding

the pending closure of the Ecusta mill. The first was to Jerry Stuart as

president of the local union.

> If the Union and the Company cannot come to a new collective
> bargaining agreement the plant, known as RFS Ecusa Inc. and
> located at One Ecusta Road, Pisgah Forest, North Carolina,
> will shut down permanently between October 22, 2002, and
> November 4, 2002 in its entirety. A plant closure will result in a
> termination of all the bargaining unit employees represented by
> Local No. 2-1971.
>
> The plant closure is a direct result of the significant loss of
> customers and operating costs that exceed the revenue that
> can be obtained from within our markets. . . .

**Joint Ex. 26.** The second letter provided notice of the pending closure to

the ESC.

As of this writing, it is expected that approximately 882 employees (including hourly employees laid off back to July 2000) will be affected by this job action.  The planned employment losses from this location are expected to be permanent.  There are 723 employees who will suffer an employment loss pursuant to this notice that are in a collective bargaining unit represented by PACE Local No. 2-1971 . . . .  Also the plant closing will affect 123 exempt and 36 non-exempt employees.

**Joint Ex. 27.**  Steve Smith sent a third letter to the local union members,

explaining the current situation and the future of the mill and its employees

without a new collective bargaining agreement.

By way of background, as most of you know, following many months of working under the terms of the collective bargaining agreement with the Union that expired in the Fall of last year and of negotiating without success to reach a new agreement, the Company came to the point where it made its last, best and final offer for a new labor contract on July 18, 2002, just over a month ago. . . .

Based on what I have heard and have read in the newspapers, however, the Union membership did not even take a ratification vote on the Company's proposal.  That is why, in large part, the represented employees are currently locked out.  Simply put, we can no longer continue to operate this business at wage and benefit levels we cannot afford while waiting on the Union membership to accept a reasonable contract proposal. . . .

I want you to understand what this lockout means.  If the Union were to ratify the Company's proposal made on July 19, we would reopen the plant and return to work as many employees as necessary to meet production requirements.  With a labor agreement, we could approach current and former customers, as well as new customers, and attempt to obtain business for

the mill which we believe can only be obtained when we have a
stable labor relationship.  With a new labor agreement, surely
there will be employment for many who are currently locked
out, and our hope for the future would be that we would rebuild
the business as quickly as we can and thus return others to
work over time.

**Df. Ex. 24.**  However, despite these communications, the evidence shows

that at least as early as August 27, 2002, Nathu Puri did not want the

company to do anything that might push the union to accept the LBF offer.

Another twist, if we cause the union not to receive
unemployment, they might ratify the contact [sic] before 10/22
and Nat does not want that.

**Pl. Ex. 130; *see also*, Trial Tr. vol. 2 at 361 (testimony of Steve Smith**

**that Nathu Puri did not want the last offer to be accepted by the**

**union).**

Beginning approximately August 17, 2002, and continuing into

September 2002, the Unemployment Insurance division of the ESC sent

notices to Ecusta requesting separation information in connection with

claims for unemployment benefits.  **Pl. Ex. 20, 22 23, 29.**  These forms

were completed on behalf of the company by Belinda Cooper, Ecusta's

personnel manager.  **Trial Tr. vol. 3 at 682.**  The forms bear completion

dates between August 22 and September 9, 2002, and show that up to and

including September 9, Cooper was marking "no work available" as the

reason for the employees' separation from the company.  **Pl. Ex. 20, 22, 23, 29.**  Beginning September 9, Cooper started writing "lockout" on the ESC forms.  **Pl. Ex. 23, 29.**  Cooper testified that she did not write "lockout" from the beginning because "normally I just marked a box and sent it in," and there was "not a box [to check] for lockout."  **Trial Tr. vol. 3 at 682-83.** Although she testified that she "may have had a discussion with the Employment Security Commission" which led her to begin writing "lockout" on the forms, she did not explain why, as personnel manager of the Ecusta mill, she was either (1) apparently unaware that a purported lockout was taking place, or (2) if she was aware that a purported lockout was taking place, why she waited until nearly a month after the employment action in question (and the completion of numerous ESC forms) to determine how the ESC forms should be completed.  ***Id.*, at 686.**

In addition to the ESC unemployment insurance forms completed by Cooper, the company also prepared a document titled "** Hourly Employees Laid Off Effective 08/19/02 **."  The Court was provided with only the odd-numbered pages, the names on which total 242 employees.[9]

---

[9] Each of the pages provided contains exactly eleven names; it would appear that the full list contained the name of each hourly employee actively employed at the Ecusta mill immediately prior to the purported

**Pl. Ex. 30.** Richard Wall testified that the document was generated by Belinda Cooper's office to send to the ESC. **Trial Tr. vol. 3 at 717-20.**

Ultimately, the union did not ratify the company's last, best, and final offer, and on October 22, 2002, Steve Smith sent notices to all union members that their employment with Ecusta was terminated. **Df. Ex. 31.** At or near the same time, RFS Ecusta, Inc., and its sister company RFS U.S., Inc., filed for bankruptcy. **Df. Stip. Fact #68; Trial Tr. vol. 2 at 323.**

## C. Conclusions of Law

Based on the appropriate legal standard and the findings of fact stated *supra*, the Court makes the following conclusions of law in regards to Plaintiffs' WARN Act violation claim.

The employment action in question occurred on August 16, 2002. Consequently, the "snapshot" date for purposes of the WARN Act was June 17, 2002. The Court finds that as of that date, RFS Ecusta, Inc., employed more than 100 employees, exclusive of part-time employees. RFS Ecusta, Inc., therefore, qualifies as an "employer" for purposes of the WARN Act and was subject to the Act's notice requirements.

---

lockout.

On August 16, 2002, RFS Ecusta, Inc., took an employment action that it termed a "lockout," keeping upwards of 400 union employees (not counting those previously laid off with recall rights) from their previous work. None of these employees were ever returned to their jobs. There was, therefore, a "plant closing" or "mass layoff" ordered by RFS Ecusta, Inc., at the Ecusta mill on August 16, 2002. The "mass layoff"[10] on August 16, 2002, came without WARN Act notice of any duration, much less 60 days' notice.

Based on the foregoing, the Plaintiffs have carried their burden as to a *prima facie* case under the WARN Act. To avoid liability, the burden rests with RFS Ecusta, Inc., to establish the applicability of the "lockout exemption;" the Court finds it has failed to do so.

First, RFS Ecusta, Inc., failed to establish that there was "available work" for Plaintiffs to perform. The only evidence regarding "available work" came in the form of contradictory testimony regarding Ecusta's relationship with Bowne. David Poor testified that there were still orders from Bowne to be filled as of August 16, 2002; Steve Smith testified that

---

[10] For purposes of simplicity, Defendant's employment action will simply be termed a "mass layoff" throughout the remainder of this Memorandum of Decision.

Ecusta had "a commitment" from Bowne, but could not say definitively whether or not Ecusta had orders from Bowne. Assuming *arguendo* that there was some level of "available work" at Ecusta on August 16, there is a clear lack of evidence regarding the amount of such work, the number of union employees this work would have sustained, or for how long. There is likewise a lack of evidence regarding any other "available work" on the new side of the mill or any "available work" at all on the old side.

The burden of establishing the applicability of the lockout exemption, including that the employees kept away from the workplace were kept away from "available work," rests with the employer. The Court cannot find that broad statements to the effect of "we had a commitment from Bowne" and pure guesses as to the amount of any "available work" satisfies this burden. Given the purpose and nature of the WARN Act, the Court cannot find that Congress intended for an employer to be able to avoid its WARN Act obligations to more than 400 employees by purportedly locking out these employees from work that existed, by even the best *guess*, for less than half of these workers. An employer who seeks the protection of the lockout exemption must come forward with more than did RFS Ecusta, Inc., in this case.

In addition, even if Defendant RFS Ecusta, Inc., had presented sufficient evidence to satisfy the "available work" portion of the lockout exemption, the Defendant failed to prove that the purported lockout was not intended in large part to evade the requirements of the WARN Act. The greater weight of the evidence, including that which is recounted above and that which was submitted and considered by the Court but not specifically included herein, shows that:

(1)     RFS Ecusta, Inc., had been in financial trouble since the October 2001 union strike.

(2)     Despite efforts to end the labor dispute and hopefully turn around the fortunes of the company, the labor dispute drug on and the company continued losing money and customers throughout the spring and summer of 2002.

(3)     Within one month of the purported lockout, the company learned both that future orders from its largest customer (Bowne) would be "conservative" due to circumstances in the financial market, and that, due to settlement of the labor dispute at SMI, it would not be receiving anticipated orders for the old side of the mill.  This was in addition to the knowledge that August was an historically slow month for the mill.

(4)     RFS Ecusta's chief financial and operations officer, the director of accounting, and controller all believed the company was broke and out of business by mid-August 2002.

(5)     TBCC, the institution from which Ecusta obtained its funding, was informed by Ecusta's management that the business was closing due to financial reasons.

(6)     By mid-August, the company could not afford to purchase raw
        materials for whatever few orders it may have had or to pay its
        employees for the coming week, much less for another 60 days.

(7)     The company had to borrow money just to make the payroll it was
        obligated to pay in mid-August.

(8)     Termination of the purported lockout hinged on the union's
        acceptance of a proposal that Steve Smith did not think they would
        accept and that Nathu Puri did not want them to accept.

(9)     Even if the LBF offer had been accepted by the union, the company
        was only returning to work a limited number of employees, thereby
        ridding itself of employees for which it had no work and could not
        afford to pay.

(10)    In addition to the loss of most of its customers and money, the mill
        was in need of $5 million annually just for maintenance purposes and
        upwards of $20 million in arrears in capital expenditures.

(11)    Steve Smith, by all accounts the leader at the mill, expressed his
        belief that the employment action was a layoff rather than a lockout.
        This opinion was testified to by multiple witnesses, evidenced by
        notes made contemporaneous with his statement, and not denied by
        Smith during his trial testimony.

(12)    One of the express purposes of the purported lockout was to avoid
        paying each of the laid-off workers 60 days' wages and benefits.

        With such evidence at hand, the Court cannot find that avoidance of

the WARN Act's notice requirements was not one of the chief reasons for

calling the purported lockout due to the company's inability to pay its

employees during the 60 days for which they were entitled to notice.  There

is evidence that the company discussed the "lockout option" prior to the

instituted action.  However, despite whatever intentions the company may have had during these early discussions, by the time the purported "lockout" was actually instituted, it was clearly taken for financial reasons and to avoid the 60-days' wages obligation to the displaced workers rather than as a bargaining tool or strategy.

For the reasons stated above, the Court finds that Plaintiffs satisfied their burden of establishing a *prima facie* case of a WARN Act violation by RFS Ecusta, Inc.; RFS Ecusta, Inc., failed to satisfy its burden of proving the applicability of the lockout exemption, which was the only basis for liability-avoidance asserted by RFS Ecusta, Inc.; RFS Ecusta, Inc., is liable to Plaintiffs under the WARN Act for ordering a mass layoff without 60 days' notice, and that liability now being an indebtedness of the bankruptcy estate.


### III. INDIRECT LIABILITY FOR WARN ACT VIOLATION

Having found that a violation of the WARN Act occurred, Plaintiffs ask the Court to assess liability not only against RFS Ecusta, Inc., but also against RF & Son, Inc. (RFS Ecusta's parent corporation) and Purico (IOM), Ltd. (RFS Ecusta's great-grandparent corporation).  Plaintiffs argue

that these two corporations are directly liable as "employers" because they are listed as "buyers" on the acquisition agreement.  In the alternative, Plaintiffs ask the Court to assess indirect liability for the WARN Act violation against Purico (IOM), Ltd., and RF & Son, Inc., under principles allowing remote corporate owners to be held liable for WARN Act violations.  Finally, Plaintiffs also seek to hold Nathu Puri personally liable for the WARN Act violation by "piercing the corporate veil."

## A. RF & Son, Inc., and Purico (IOM), Ltd.

### (1) Direct Liability as "Employers"

Plaintiffs argue that both RF & Son, Inc., and Purico (IOM), Ltd., should be held directly liable for the WARN Act violation as "employers" because the  name of each company name appears as a "buyer" in various places throughout the acquisition agreement and the "buyers" assumed the collective bargaining agreement.  *See*, **Joint Ex. 9.**  The Court does not believe this is controlling, however.

To be an "employer" under the WARN Act, one must have a requisite minimum number of "employees" who are then wronged by the employer's employment action in violation of the WARN Act.  Here, the parties

stipulated that "RF & Son, Inc., a Delaware Investment Holding Company (DIHC), had no employees and at no time employed [any] employees at the Ecusta Mill." **Df. Stip. Fact # 15.** By definition, Plaintiffs stipulated that RF & Son, Inc., was not an "employer" for purposes of the WARN Act. As to Purico (IOM), Ltd., there is no evidence that it had any "employees," that any "employees" it did have included Plaintiffs, that it ever acted as or was treated by Plaintiffs as being their "employer," or that any entity other than RFS Ecusta, Inc., acted in or was treated by Plaintiffs in that manner. The Court, therefore, finds that neither RF & Son, Inc., nor Purico (IOM), Ltd., were "employers" as that term is used within the WARN Act.

**(2) Remote Corporate Owner Liability (*i.e.*, indirect liability)**

To determine whether remote corporate owners should be held liable under the WARN Act, the Court utilizes the Department of Labor test, which requires the balancing of five factors. *Local 2-1971 of PACE Int'l Union v. Cooper*, 364 F.Supp.2d 546, 565-66 (W.D.N.C 2005).

> Subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) *de facto*

exercise of control, (iv) unity of personnel policies emanating
from a common source, and (v) the dependency of operations.

**20 C.F.R. §§ 639.2, 639.3;** *see also***, *Pearson v. Component Tech.***

***Corp.*, 247 F.3d 471, 489-90 (3d Cir. 2001).** The burden of satisfying this

test rests with the Plaintiffs.

The first factor to consider is common ownership and is met as to RF

& Son, Inc., as it wholly owns RFS Ecusta, Inc. ***See, e.g., Vogt v.***

***Greenmarine Holding, LLC*, 318 F.Supp.2d 136, 142 (S.D.N.Y. 2004).**

The Court notes, however, that while this factor technically counts against

RF & Son, Inc., "[t]he finding of common ownership . . . is of limited

significance to the inquiry at hand, since it is well established that stock

ownership alone is not grounds for holding a parent liable for its

subsidiary's actions." ***Id.* (citing *United States v. Bestfoods*, 524 U.S.**

**51, 61-62 (1998)).** The "common ownership" factor is not met as to Purico

(IOM), Ltd. Purico is the great-grandparent company of RFS Ecusta, Inc.,

and owns no stock directly in Ecusta. ***Id.***

Second, the Court must consider whether there were shared

directors and/or officers between RFS Ecusta, Inc., and RF & Son, Inc.,

and between RFS Ecusta, Inc., and Purico (IOM), Ltd. As to RFS Ecusta,

Inc., and RF & Son, Inc., these parties shared numerous directors and

officers, including Upendra Puri, Steve Smith, and Ajay Badhwar. This factor is, therefore, met as to RF & Son, Inc. **Pl. Ex. 76-A.** Like the first, however, this factor is of limited significance in the instant inquiry.

> "It is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary. . . . Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, it cannot be enough to establish liability . . . that dual officers and directors made policy decisions and supervised activities at the [subsidiary].

*Vogt*, *supra* **(quoting** *Bestfoods*, **524 U.S. at 69-70).**

In regards to Purico (IOM), Ltd., there is no evidence of exactly who the directors or officers were during the relevant time period. There was no testimony in that regard; and Purico (IOM), Ltd., does not appear on Plaintiffs' Exhibit 76-A, which shows the officers and directors of what appears to be every other company in the corporate "family." *See,* **Pl. Ex. 76-A.** Although there are documents appearing in the acquisition agreement that reflect Upendra Puri as a director of Purico (IOM), Ltd., as of August 9, 2001, this was a full year prior to the "mass layoff," and is not indicative of whether there were common directors and/or officers at the time the mass layoff was instituted. *See,* **Joint Ex. 9.** Therefore, the Court cannot find that there was commonality in directors and/or officers. This

factor is of such limited importance, however, that its presence or absence does not effect the outcome in this particular case.

The third prong of the five-part test is the "*de facto* exercise of control" factor. This factor asks whether "the parent . . . was the decisionmaker responsible for the employment practice giving rise to the litigation." ***Pearson,* 247 F.3d at 503-04.** This is perhaps the most important of the five factors, and rightly so. ***Id.,* at 504 ("[B]ecause the balancing of the factors is not a mechanical exercise, if the de facto exercise of control was particularly striking . . . then liability might be warranted even in the absence of other factors.").** Indirect liability is intended to allow an aggrieved party to recover damages from one who cannot be held directly liable under the applicable law, but who nonetheless bears responsibility for the action in question. Where an aggrieved plaintiff has failed to establish that the party to be charged with indirect liability was responsible for the employment practice complained of, a court should take pause before assigning liability to that party. In this case, Plaintiffs have failed to establish *de facto* exercise of control over RFS Ecusta, Inc., by either Purico (IOM), Ltd., or RF & Son, Inc. There is

no evidence that either of these companies was responsible in any way for the mass layoff that occurred at the Ecusta mill.[11]

The fourth factor is the "unity of personnel policies" prong. Under this factor, the Court should focus "less on the hierarchical relationship between the companies (as such relationships may be considered in other aspects of the test) than on whether the companies actually functioned as a single entity with regard to its relationships with employees." *Id.,* **at 499.** Plaintiffs have failed to present any evidence of a "unity of personnel policies" between RFS Ecusta, Inc., and either Purico (IOM), Ltd., or RF & Son, Inc.

The fifth and final factor in the Department of Labor test is the "dependency of operations" factor. "[F]or such an all-encompassing factor . . .which, by its nature, looks to the daily function of the two companies – the plaintiffs must establish the existence of what was known at common law as a 'master-servant' agency relationship." *Id.,* **at 501.** As with the

---

[11] Plaintiffs stated in their trial brief that "the evidence will show the *de facto* control of Nathu Puri over almost everything in Ecusta operations." **Plaintiffs' Trial Brief, at 6.** While that fact may be true, the issue here is whether RF & Son, Inc., and/or Purico (IOM), Ltd., *as corporations* – not whether Nathu Puri as an individual who also happened to be the majority owner in these other corporations – exercised *de facto* control over RFS Ecusta, Inc.

third and fourth factors, Plaintiffs have fallen short in their duty to present evidence that would support a finding of a "dependency of operations" between RFS Ecusta, Inc. and either RF & Son, Inc. or Purico (IOM), Ltd.

Having considered and balanced the five factors discussed above, the Court finds that Plaintiffs' indirect liability assertions against both RF & Son, Inc., and Purico (IOM), Ltd., are based almost entirely on the fact these entities are within the same corporate "family" as RFS Ecusta, Inc. The Court further finds that Plaintiffs have presented an insufficient basis upon which to extend remote (*i.e.*, indirect) liability for the WARN Act violation in this case to either RF & Son, Inc., or Purico (IOM), Ltd.

## B. Piercing the Corporate Veil

An individual cannot be held directly liable under the WARN Act. *See*, **29 U.S.C. § 2101(a)(1) (defining an employer as a "business enterprise").** Nevertheless, an individual can be held liable for a WARN Act violation through the process known as "piercing the corporate veil." *See, e.g., In re Shelby Yarn*, **306 B.R. 523, 540 (W.D.N.C. 2004) ("piercing the corporate veil" applicable to WARN Act cases).**

> "[T]he federal standard for when it is proper to pierce the corporate veil is notably imprecise and fact-intensive. Federal

courts are not bound by the strict standards of the common law alter ego doctrine which would apply in a tort or contract action. Nor is there any litmus test in the federal courts governing when to disregard corporate form. Instead, the rule in federal cases is founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity. . . . Given the need to consider the purposes of the federal statute, [courts] have crafted what [they] termed a 'less rigorous' veil-piercing standard tailored to [WARN Act] cases in order to fulfill that statute's goals."

*Local 2-1971 of PACE Int'l Union*, 364 F.Supp.2d at 565-66 (quoting

*Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210

F.3d 18, 26-27 (1st Cir. 2000)); *see also*, *Thomas v. Peacock*, 39 F.3d

493, 502-05 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 349 (1996).

The mere fact that an individual has a substantial ownership interest in a

corporation is not alone sufficient to pierce the corporate veil. *See, e.g.,*

*Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d

1044, 1047 (4th Cir. 1988). Instead, the Court utilizes a two-prong test to

determine whether it is appropriate to pierce the corporate veil in a

particular case:

"(i) was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations."

***In re Shelby Yarn***, ***supra*** **(quoting *Minnesota Laborers Health &***

***Welfare Fund v. Scanlan*, 360 F.3d 925, 928 (8th Cir. 2004)); *see also*,**

***Local 2-1971 of PACE Int'l Union*, 364 F.Supp.2d at 566.**

> The "separate corporate identity" prong is meant to determine
> whether the stockholder and the corporation have maintained
> separate identities. . . .  In determining whether the
> personalities and assets of the corporation and the
> stockholders have been blurred we consider (i) the degree to
> which the corporate legal formalities have been maintained,
> and (ii) the degree to which individual and corporate assets and
> affairs have been commingled.

***NLRB v. Greater Kan. City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993)**;

***see also*, *Huennekens v. Reczek*, 43 Fed. Appx. 562, 567 (4th Cir. 2002).**

More specifically, under this first prong it is appropriate to consider:

> (1) whether a corporation is operated as a separate entity; (2)
> commingling of funds and other assets; (3) failure to maintain
> adequate corporate records or minutes; (4) the nature of the
> corporation's ownership and control; (5) absence of corporate
> assets and undercapitalization; (6) use of a corporation as a
> mere shell, instrumentality or conduit of an individual or another
> corporation; (7) disregard of legal formalities and the failure to
> maintain an arms-length relationship among related entities;
> and (8) diversion of the corporation's funds or assets to
> noncorporate uses.

***Greater Kan. City Roofing*, 2 F.3d at 1052 n.6; *see also*, *Kinney Shoe***

***Corp. v. Polan*, 939 F.2d 209, 211 n.\* (4th Cir. 1991).**  Turning to the

second prong of the two-part test, "we ask whether there is adequate

justification to invoke the equitable power of the court." ***Greater Kan. City***

***Roofing, supra***.

> We require an element of unfairness, injustice, fraud, or other inequitable conduct as a prerequisite to piercing the corporate veil. . . . It should be emphasized that the showing of inequity necessary to satisfy the second prong must flow from the misuse of the corporate form. The mere fact that a corporation commits an unfair labor practice, or breaches a contract, or commits a tort, does not mean that the individual shareholders of the corporation should personally be liable. . . . It is only when the shareholders disregard the separateness of the corporate entity and *when that act of disregard causes injustice or inequity or constitutes the fraud* that the corporate veil may be pierced. . . . Furthermore, the individual who is sought to be charged personally with corporate liability must have shared in the moral culpability or injustice that is found to satisfy the second prong of the test.

***Id.*, at 1052-53 (emphasis added) (footnotes and internal citations**

**omitted).**

A court's authority to pierce the corporate veil "is to be exercised

'reluctantly' and 'cautiously[.]'" ***DeWitt Truck Brokers, Inc. v. W. Ray***

***Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976).** Nevertheless,

"courts will not hesitate to take such action when justice so requires.

Determining when 'justice so requires' necessitates a careful review of the

circumstances of each case - a factual inquiry particularly within the

province of the district court." ***Keffer v. H.K. Porter Co.*, 872 F.2d 60, 64**

**(4th Cir. 1989) (internal citations omitted).** Finally, as the party seeking

to disregard the corporate form, the Plaintiffs bear the burden of

establishing, by clear and convincing evidence, a sufficient basis for doing

so. ***Kinney Shoe Corp.**, **supra**; **Trustees of Nat'l Elevator Indus.***

***Pension, Health Benefit & Educ. Funds v. Lutyk**, 332 F.3d 188, 194 (3d*

**Cir. 2003) (clear and convincing evidence required).**

In this case, there is clear evidence that Nathu Puri disrespected the

separate identity of the corporation to such an extent so as to make

indistinct its personality and assets from those of himself. He represented

himself to customers, financiers, employees, and the general public as the

owner of the mill. ***See, e.g.**, **Pl. Ex. 71, 80, 81, 83-86; Trial Tr. vol. 1 at***

**33-36, 140.** Despite testimony to the contrary, he was also intimately

involved in most actions and decisions at the mill, especially the

negotiations with the union. ***See, e.g.**, **Pl. Ex. 99, 101, 103, 123, 126; Df.***

**Ex. 16; Joint Ex. 29; Trial Tr. vol. 2 at 323, 342.** When he was not

physically present at the negotiation sessions, he was being kept

constantly abreast of the situation and made suggestions regarding the

company's negotiation matrixes. **Pl. Ex. 78, 79; Joint Ex. 29; Trial Tr.**

**vol. 2 at 335; Handman Deposition, at 31-32.** At one point, he held a

secret meeting with Bob Smith regarding the labor crisis.  **Deposition of Nathu R. Puri, taken July 15, 2004, at 113.**[12]  He was involved in, and in some cases directed, monetary transactions between various corporations (including RFS Ecusta, Inc.) in the corporate "family" that failed to take on the appropriate "arms-length" character.  **Pl. Ex. 107, 110, 111, 117, 117-A.**  Despite his testimony that he made "suggestions" but did not direct anyone to do anything, other evidence reveals that Upendra Puri, Ecusta's chief executive officer, considered himself to be the "puppet of a rich uncle," and that Steve Smith grew weary of Nathu Puri's constant direction. **Trial Tr. vol. 2 at 326 (Upendra Puri described himself as the puppet of a rich uncle); Pl. Ex. 94.**[13]  Based on this evidence, the Court has little difficulty finding that Nathu Puri blurred the line between his and the corporation's personalities.

---

[12] Puri's deposition was made a part of the record.  **Trial Tr. vol. 3 at 618.**

[13] In Plaintiffs' Exhibit 94, Steve Smith remarks to Nathu Puri: "Now [I] am down here in North Carolina under the most unusual and stressful of situations, but up to today I was enjoying the challenges, but *if you are going to second guess and for the pass [sic] three months tell me want [sic] to say and do* it will not be a job that I will want [to] continue on with." **Pl. Ex. 94 (emphasis added).**

This, however, is not enough for the Court to pierce the corporate veil to impose personal liability on Nathu Puri.  Plaintiffs also have the burden of proving by clear and convincing evidence that the failure of this Court to pierce the corporate veil would result in the sanctioning of a fraud or the promotion of injustice or inequity.  ***In re Shelby Yarn*, *supra*.**  The Court finds that Plaintiffs have satisfied this burden.  While the Court does not believe Puri was acting in bad faith in relation to the union, nor that the actions of the union representatives in this case were especially laudable, neither of these things mean that Puri was free to dominate RFS Ecusta, Inc., without accepting the consequences.

More specifically, Nathu Puri directed or was otherwise involved in the shifting of funds from one corporation in the "family" to another without proper (and, in some cases, any) documentation.  **Puri Deposition, at 71, 73-75, 89, 94-95; Trial Tr. vol. 1 at 270-76; Pl. Ex. 90, 104, 107-A, 107-L, 108, 110; Trial Tr. vol. 2 at 301-05, 342-45, 347; Trial Tr. vol 4 at 839-41, 880-82.**  He was involved in the sale of Purico U.S., grandparent of RFS Ecusta, Inc., to a relative for $1.00 when Defendant RF & Son, Inc., a subsidiary of Purico U.S. and the parent of RFS Ecusta, Inc., had assets valued in the millions of dollars.  **Puri Deposition, at 25-26, 34-37.**  He

was involved in the reclassification of monies provided to RFS Ecusta, Inc., as "loans" rather than capitalization in an attempt to recover part of the money given when the ship started sinking.  However, there were no promissory notes or any other documentation one would expect for a loan of this nature.  **Id., at 84-85, 97, 104.**  As a final example, there is evidence that in attempting to assuage the concerns of TBCC, Puri actively represented that $10 million in excess pension plan funding was an additional asset of the company, and that "there may be a way to terminate the plan in which . . . there would be money left over which might revert back to the company, allowing it to have some liquidity."  **Handman Deposition, at 119-21.**

In other words, Puri controlled and used to his advantage the finances of RFS Ecusta, Inc., from pre-acquisition through the time it became apparent that his own financial assets were at risk.  Then, once things turned sour, he inexplicably had no knowledge of the difficulties at the Ecusta mill or at the other corporations.  He also professed no recollection of a $1.5 million deposit into his personal bank account.  The taxes on this deposit were paid by RFS Ecusta, Inc., although the purported "dividend" came from a wholly separate corporation.  **Puri**

**Deposition, at 73-75; Trial Tr. vol. 1 at 270-76; Pl. Ex. 107-A, 107-L, 108, 110; Trial Tr. vol. 2 at 300-02.** Given Nathu Puri's use of RFS Ecusta, Inc. (and, in fact, the entire family of corporations) for his own financial advantage and purposes, the Court finds that it would be inequitable and unjust to *now* permit Puri to cloak himself in the protection of the corporate veil that he has had little trouble casting off so easily in the past.

The Court is satisfied that the showing necessary to pierce the corporate veil has been made by clear and convincing evidence that Nathu Puri dominated RFS Ecusta, Inc., so as to blur his personality with that of the corporation. Further, based on Puri's transactions with and treatment of RFS Ecusta, Inc., it would be inequitable and unjust to now allow him the protections of a corporate structure he has so freely ignored. The Court, therefore, finds Nathu Puri jointly and severally liable for the WARN Act damages in this case.

## IV. DEFENDANTS' REQUESTED REDUCTION OF DAMAGES

The WARN Act provides that an employee aggrieved by a violation of the WARN Act may be awarded an amount totaling a maximum of 60 days'

wages and benefits.  *See* **29 U.S.C. § 2104(a)(1).**  The Act allows the amount of damages to be reduced, however, where it is established that the employer acted in "good faith."  *See* **29 U.S.C. § 2104(a)(4).**

To warrant a reduction in the amount of damages, a defendant must prove to the satisfaction of the Court "that the act or omission that violated [the WARN Act] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [the WARN Act]."  **29 U.S.C. § 2104(a)(4);** *Childress v. Darby Lumber, Inc.,* **357 F.3d 1000, 1007 (9th Cir. 2004) ("[G]ood faith is an affirmative defense as to which defendants have the burden of proof[.]").**  The test "requires a showing by the employer of *subjective intent* to comply with the [WARN] Act as well as evidence of *objective reasonableness* by the employer in applying the [WARN] Act."  *Id.* **(citation omitted) (emphasis added).**  Moreover, "[e]ven where good faith is manifest, . . . the decision to reduce the amount of damages is within the discretion of the district court."  *Saxion v. Titan-C-Mfg., Inc.,* **86 F.3d 553, 562 (6th Cir. 1996).**

The greater weight of the evidence in this case shows that the management team at RFS Ecusta, Inc., while relying in part on the advice of the company's legal counsel with respect to the WARN Act, was

nevertheless well aware of the WARN Act and its requirements. ***See, e.g.,
Trial Tr. vol. 2 at 384, 409, 413, 418.*** More specifically, the evidence
shows that it was known to these persons that WARN Act notice was
required in layoff situations. ***Id., at 413.*** Finally, the evidence also shows
that Steve Smith, the "head man" on-site at Ecusta, considered the
employment action at issue to be a layoff rather than a lockout, and that
every other member of the management team knew the company was
broke and could no longer afford to continue in business - the
quintessential reason for laying off employees. **Trial Tr. vol. 1 at 257-58;
vol. 2 at 263, 316-17, 319-20; Pl. Ex. 126, 129.**

When considering management's knowledge, however rudimentary,
regarding the necessity of WARN Act notices in layoff situations, in
combination with the clear belief of management - stated by some, and
clear from the testimony of others regarding their understanding of the
situation at the mill - that this was a layoff rather than a lockout, the Court
cannot find that RFS Ecusta, Inc., had a subjective intent to comply with
the WARN Act in this particular instance. Damages will, therefore, not be
mitigated on the basis of "good faith."

## V. DAMAGES FORMULA

This case was bifurcated by consent of the parties and order of the Court. **See, Order filed May 2, 2002 (bifurcating the issue of damages); Joint Motion *in Limine* to Bifurcate Issues Regarding Calculation of Amounts Owed to Individual Workers; *see also*, *Saxion*, 86 F.3d at 556-57 (rejecting challenge to trial court's bifurcation of WARN Act trial).** Due to the tedious nature of determining the amount of damages for each individual Plaintiff, the parties requested an opportunity to resolve this issue between themselves. The Court has previously granted this request, with the proviso that if the parties are unable to reach a consensus on the individual damage awards, the Court would refer the matter to a special master for determination.

Therefore, if the parties cannot agree on the amount of damages for each individual employee within 60 days, using the formula set forth below, the Court will refer this issue to a special master for determination.

Damages shall be computed as follows:

(1) Each "aggrieved employee" shall recover the value of wages and benefits for a period of 60 calendar days, to be determined using the number of days the employee would have actually worked in the 60-day

period.  **See, *Carpenters Dist. Council*, 15 F.3d at 1286 ("[D]amages in lieu of the WARN Act notice are to be calculated using . . . the number of work days within the violation period."); *Saxion*, 86 F.3d at 561 (same)*; Breedlove v. Earthgrains Baking Cos., Inc.*, 140 F.3d 797 (8th Cir. 1998) (same).**

If the parties are unable to agree on the number of days a particular employee would have worked in the 60-day period, the number shall be determined by finding the average number of days worked in the previous three 60-day periods prior to the mass layoff.  If an employee had not been employed by RFS Ecusta, Inc., for 180 days or more at the time of the mass layoff, the average shall be determined using the previous two 60-day periods.  If the employee had been employed for less than 120 days, the appropriate number of days shall be determined based on the 60-day period immediately preceding the August 16, 2002, mass layoff.

(2) If any employee was employed by RFS Ecusta, Inc., for less than 120 days, his or her damages should be calculated on the basis of one-half

the number of days employed, rounded down to the nearest full day.[14] **29 U.S.C. § 2104(a)(1)(B).**

(3) The appropriate amount of wages for each individual employee shall be at a rate equal to the higher of: (i) the average regular rate received by the employee during the last 3 years of employment with RFS Ecusta, Inc.; OR (ii) the final regular rate received by the employee (*i.e.*, the employee's regular rate as of August 15, 2002). **29 U.S.C. § 2104(a)(1)(A).**

(4) The appropriate amount of benefits for each individual employee shall be the benefits to which the employee was entitled under the RFS Ecusta, Inc., Hourly Employees' Retirement Plan, as well as any other plan described in 29 U.S.C. § 1002(3). The amount shall include the cost of medical expenses incurred during the 60 days which would have been covered under the applicable plan(s) if the employment loss had not occurred, provided that any such amount not actually paid by the employee, or paid by the employee but reimbursed by a third party, shall

---

[14] For example, if an employee was employed for only 115 days prior to the mass layoff on August 16, 2002, rather than attempting to ascertain damages based on 57 ½ days, damages shall be calculated using 57 days.

be excluded. **29 U.S.C. § 2104(a)(1)(B);** *Washington v. Aircap Indus.,*

*Inc.*, **860 F. Supp. 307, 312 (D.S.C. 1994) (purpose of WARN Act**

**remedies is to put the employee in the position he or she would have**

**been absent the violation, not to create a windfall).**

(5) The total amount of damages for each individual employee shall

be reduced by:

(A) any wages paid by RFS Ecusta, Inc., to the employee for
the period of the violation;

(B) any voluntary and unconditional payment by RFS Ecusta,
Inc., to the employee that was not required by any legal
obligation; and

(C) any payment by RFS Ecusta Inc., to a third party or trustee
(such as premiums for health benefits or payments to a defined
contribution pension plan) on behalf of and attributable to the
employee for the period of the violation.

**29 U.S.C. § 2104(a)(2).**

## VI. ATTORNEYS' FEES AND COSTS

Plaintiffs have asked the Court for an award of attorneys' fees and costs. The WARN Act allows the Court, in its discretion, to award "the prevailing party a reasonable attorney's fee as part of the costs." **29 U.S.C. § 2104(a)(6).** "[A] party need not prevail on every issue to be considered a prevailing party." ***P.R. Chunk, Inc. v. Martin Marietta Materials, Inc.*, 2006 WL 559091, \*3 (4th Cir. 2006).** Although the WARN Act's language is discretionary, "a prevailing party should ordinarily recover an attorney's fee, [unless] special circumstances . . . render such an award unjust." ***Doe v. Bd. of Educ. of Balitmore County*, 165 F.3d 260, 264 (4th Cir. 1998) (internal quotations omitted).** Although Plaintiffs here did not succeed on the remote corporate liability issues involving Purico (IOM), Ltd., and RF & Son, Inc., they did succeed on the dominant issue of the WARN Act violation. Consequently, Plaintiffs are the "prevailing party" in this case and are entitled to attorneys' fees and costs under the WARN Act.

As the parties to this case have been afforded the opportunity to resolve between themselves the issue of WARN Act damages for each individual Plaintiff, the Court will also give the parties the opportunity to

resolve the issue of attorneys' fees and costs with the sincere hope that they will do so. The parties have been given 60 days to resolve the issue of damages, at which time the matter will be referred to a special master. If the parties are unable to reach agreement on the appropriate amount of costs and attorneys' fees by the end of this 60-day period, the Court will determine, upon a properly supported motion by the Plaintiffs, the amount of attorneys' fees using the lodestar method of calculation and the amount of costs. **See, *Local Union No. 1992 of IBEW v. Okonite Co.*, 358 F.3d 278, 287 (3d Cir. 2004) (finding the lodestar method of calculation appropriate in WARN Act cases)**; ***see also***, ***Childress***, **357 F.3d at 1011 (same); *Hollowell v. Orleans Reg'l Hosp., LLC*, 217 F.3d 379, 391-92 (5th Cir. 2000) (same).**

## VII. ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiffs are entitled to compensation from Defendant RFS Ecusta, Inc., for violation of the WARN Act in an amount to be determined for each individual employee in the manner set forth *supra*. Nathu Puri, individually, is jointly and severally liable for these damages. Plaintiffs shall not recover from RF & Son, Inc.,

or Purico (IOM), Ltd.  Damages shall not be mitigated, as Defendants

failed to establish the mitigating factor of good faith.

**IT IS FURTHER ORDERED** that the parties have 60 days from entry

of this Memorandum of Decision to reach an agreement as to the

compensation due each individual employee.  The Court will entertain a

motion to extend this time limit to resolve the damages issue for cause

shown.  If the parties are unable to reach an agreement, the matter will be

referred to a special master for determination of the compensation due.  If

a special master is appointed, the parties shall share equally in the cost of

such services.

**IT IS FURTHER ORDERED** that the parties be afforded reasonable

opportunity to agree on the amount of costs and attorneys' fees owing to

Plaintiffs.  If the parties are unable to reach agreement within 60 days from

entry of this Memorandum of Decision, Plaintiff shall file a properly

supported motion for such relief.

Signed: March 31, 2006

Lacy H. Thornburg
United States District Judge